UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


| | | |
|---|---|---|
| AMC DEMOLITION SPECIALISTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-466 |
| | ) | (Shirley) |
| BECHTEL JACOBS COMPANY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| PROFESSIONAL PROJECT SERVICES, INC., | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMC DEMOLITION SPECIALISTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| CALIFORNIA BANK & TRUST, | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMC DEMOLITION SPECIALISTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |

NORTH ATLANTIC NATIONAL BANK,    )
    )
        Intervening Plaintiff,    )
    )
v.    )
    )
AMC DEMOLITION SPECIALISTS, INC.,    )
    )
        Defendant.    )

## <u>MEMORANDUM OPINION</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 9].  This matter came to be heard on July 14 and 24, 2006 on the

dispositive motions [Docs. 49, 61, 68, 71, 76] filed by the parties.  In this Order, the Court will also

address the Motion to Compel Mediation [Doc. 112] filed by the plaintiff.

## I.    <u>INTRODUCTION</u>

In this case, the plaintiff AMC Demolition Specialists, Inc. ("AMC") seeks payment

for services rendered to the defendant Bechtel Jacobs Company, LLC ("BJC") pursuant to a fixed-

price government[1] subcontract, No. 23900-BA-FS502F ("Blanket Agreement" or "Subcontract"),

which was executed on December 4, 2002 and terminated for convenience by BJC on September

7, 2004.  A copy of the Subcontract is attached to the Second Affidavit of Mark Patrick [Doc. 84]

as Exhibit 1.  The Subcontract was originally valued at $1,777,000.00 but was subsequently

---

[1]BJC is a prime contractor with the Department of Energy.

increased to $1,822,000.00. Specifically, AMC seeks payment for work performed on three different projects: (1) the Remedial Actions Stored Waste Disposition ("RASW") Project; (2) the K-1206-E Firewater Tower Demolition ("Firewater Tower") Project; and (3) the Homogeneous Research Experience Ancillary Facilities Decontamination and Decommissioning ("HRE") Project. The Task Release Agreement for each of these projects is attached to the Second Affidavit of Mark Patrick as Exhibits 3, 4, and 5 respectively.

AMC originally filed this action in the Chancery Court for Anderson County, Tennessee, alleging that AMC provided services to BJC in the amount of $373,667.84, as evidenced by a sworn account, which the Complaint states is attached as an exhibit. However, no sworn account is attached to the Complaint. [Doc. 1].

This matter was removed to this Court on October 12, 2004 on the basis of diversity jurisdiction. [Doc. 1]. In its answer [Doc. 6], BJC denies that AMC is entitled to any relief and further alleges that AMC's Complaint fails to state a claim upon which relief can be granted.

AMC filed a motion seeking to amend its Complaint on July 27, 2005. [Doc. 18]. In the Amended Complaint, in addition to the sworn account claim, AMC alleges that AMC entered into multiple additional contracts with BJC to perform certain services, but that due to BJC's breach of contract, AMC was either prevented from completing its obligations under the contract, or the cost of performance was increased. AMC alleges that it suffered a loss in the amount $1,124,268.00 due to BJC's breach of contract. The Amended Complaint further seeks to add a jury demand on all issues.[2] While BJC objected to AMC's request to add a jury demand to its Complaint, BJC did

---

[2]The Amended Complaint also seeks to add the Department of Energy as a defendant. However, the plaintiff subsequently withdrew this portion of the motion to amend.

not object to the addition of the breach of contract claims. [Doc. 20]. The Court permitted the amendment of the breach of contract claims on November 30, 2005. [Doc. 37].

Professional Project Services, Inc. ("Pro2Serve") was permitted to intervene in this action. [Doc. 19]. In its Intervening Complaint, Pro2Serve alleges that it subcontracted with AMC to perform a portion of the work on the demolition on the HRE Project, and that AMC owes Pro2Serve the sum of $299,156.41 for services performed. [Doc. 21].

California Bank & Trust ("CALBT") was also permitted to intervene. [Doc. 31]. In its Intervening Complaint [Doc. 32], CALBT alleges that AMC is in default of the loan agreement between the parties in the amount of $137,807.63, plus interest. CALBT further asserts that it is entitled to a complete satisfaction of the judgment out of the first proceeds recovered by AMC from BJC ahead of Pro2Serve and any other claims asserted by any other party.

North Atlanta National Bank ("NANB") was also permitted to intervene in this cause. [Doc. 37]. In its Intervening Complaint [Doc. 36], NANB alleges that AMC has defaulted on a promissory note to NANB, and that in the event that AMC is awarded a judgment against BJC, NANB is entitled to recover a portion of that judgment in the principal loan amount of $225,250.00 plus interest, costs and reasonable attorney's fees.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

III.    **AMC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

AMC moves for partial summary judgment with respect to the services it rendered on the HRE Project. AMC claims that at the time that the Subcontract was terminated on September 7, 2004, AMC had incurred a total of $891,724.83 in direct and indirect costs on the HRE Project. After giving credit for payments already received, AMC claims that it is entitled to a judgment in the amount of $648,934.83, plus prejudgment interest. AMC further claims that BJC has refused to negotiate the resolution of AMC's claims in good faith, and AMC therefore requests that the Court enter a judgment in favor of AMC on the issue of BJC's failure to negotiate in good faith or make a specific finding of fact that BJC has failed to negotiate the resolution of these claims in good faith. [Doc. 49].

A.    **The Termination**

The Subcontract sets forth both General and Specific Conditions. The termination clause, which is outlined in GC-17, provides, in pertinent part, as follows:

**GC-17 TERMINATION**

A. CONTRACTOR reserves the right to terminate this Subcontract in whole or in part for . . . 2) for **Convenience** if CONTRACTOR determines that such termination is in the best interest of CONTRACTOR or the Government.

\*       \*       \*

C. In the event that any part of this Subcontract is terminated for convenience, CONTRACTOR shall notify SUBCONTRACTOR by written notice . . . .

\*       \*       \*

D. In the event of termination, SUBCONTRACTOR shall immediately stop all Work terminated and shall immediately cause any and all of its suppliers and subcontractors to cease Work.

Subject to the terms of this Subcontract, **SUBCONTRACTOR shall be paid for the Work performed prior to the notice of termination, plus reasonable charges for costs that would be allowable under FAR Part 31 that SUBCONTRACTOR can demonstrate to the satisfaction of CONTRACTOR, using its standard record keeping system, have resulted from the termination.**

SUBCONTRACTOR shall not be paid for any Work performed or costs incurred that reasonably could have been avoided. All termination settlement proposals must be submitted to CONTRACTOR within three (3) months of the issuance of the termination. The Parties may agree on the amount to be paid because of the termination; however, the agreed amount shall not exceed the Subcontract price.

[Doc. 84 Ex. 1] (Second emphasis added).

On September 7, 2004, Mark T. Patrick, the Lead Subcontract Administrator for BJC, sent a letter ("Termination Letter") to Timothy Barker, the President of AMC, notifying AMC that in accordance with GC-17, "the Blanket Agreement (BA) release is terminated for convenience in whole effective September 7, 2004" and directing AMC to "immediately stop all work, terminate subcontracts, make no further shipments, [and] place no further orders in connection with the BA release . . . ." [Doc. 50 Ex. A].

In response to the Termination Letter, Barker sent Patrick a letter [Doc. 50 Ex. B], requesting immediate payment of $260,000 in order to compensate subcontractors and vendors for services provided for the HRE project and stating that AMC would submit a settlement proposal to BJC for additional compensation pursuant to the terms of the Termination for Convenience as outlined in Patrick's letter.

AMC submitted its final settlement proposal of $768,971.00 on December 5, 2004. In response to AMC's settlement proposal, Patrick sent Barker a letter dated January 18, 2005 [Doc.

50 Ex. C], rejecting AMC's settlement proposal and offering $285,343.00 as final settlement for the termination for convenience. Specifically, Patrick states in this letter as follows:

> The pay items that were affected by the subject termination were as follows:
>
> • 1.01B Safety Basis Documentation
> • 1.01C Pre-Mobilization Standards
> • 1.02A Deactivation Plan and Verification
> • 1.02C Readiness Review
>
> AMC's total proposed settlement of $768,971 is excessive, as the agreed amount that can be paid because of the termination cannot exceed the Subcontract price per Paragraph D of the General Condition No. GC-17, entitled "TERMINATION." The total value of the work remaining under these line items is $293,000 [$348,000 (subcontract line item total) less $55,000 (payments to date)].

[Doc. 50 Ex. C]. AMC rejected BJC's settlement offer, and this lawsuit followed.

**B.     Analysis**

AMC first argues that BJC has improperly attempted to place arbitrary limitations on the payment of damages for the termination for convenience that was issued in this case. Specifically, AMC contends that BJC was in error when it itemized the value of certain line items contained in the Subcontract instead of looking at the total value of the Subcontract. AMC argues that the Subcontract was terminated completely as a "blanket agreement" termination, and that there was no language in the termination letter limiting the termination of convenience to only subparts of the parties' contract. Accordingly, AMC contends that the settlement payment to which it is entitled is limited only by the total Subcontract price of $1,822,000.00. [Doc. 53].

AMC next argues that it is entitled to a summary judgment in the amount of $648,934.93 for the net costs it incurred in performing work under the Subcontract. Specifically,

AMC argues that it is entitled to receive payment for the following direct costs: (1) employee payroll expenses in the amount of $50,791.05; (2) owner payroll expenses in the amount of $6,136.05; (3) severance pay obligations in the amount of $43,000.00; and (4) payments to the following subcontractors: Pro2Serve ($434,156.42)[3]; Auxier & Associates ($74,123.16)[4]; Turn Key Transportation Services, LLC ($7,140.00); Alpine Environmental & Safety ($2,219.00); Elvado Environmental Associates ($530.00); and Washington Services Management Solutions ($2,075.00).

In addition to these direct costs, AMC argues that it is entitled to receive indirect costs as well, including overhead (G&A) and profit. During the contract period, AMC contends that its indirect job costs and G&A totaled $467,826.26. Because the HRE Project constituted 37% of AMC's work at that time, AMC contends that the indirect job costs allocable to the HRE Project is 37% of $467,826.26, or $173,095.72. [Barker Aff. ¶ 27].

AMC also contends that it is entitled to recover expenses associated with the preparation of the Termination for Convenience. Specifically, AMC claims that it has incurred expenses in the amount of $23,233.90, not including accounting and legal expenses incurred. Finally, AMC contends that it is entitled to an award for a fair portion of profit, which AMC calculates to be 10%. [Barker Aff. ¶¶ 30, 31].

---

[3]Pro2Serve's claim against AMC is a total of $434,156.42. Pro2Serve has been paid $135,000.00 by AMC and is seeking the balance of $299,156.42. [Barker Aff. ¶¶ 16, 17].

[4]Auxier & Associates has already received $19,000.00 in payment from AMC. [Barker Aff. ¶ 19].

In sum, AMC seeks the recovery of the following amount of expenses:

| | |
|---|---|
| Direct Costs | $620,350.58 |
| Indirect Costs | 173,095.72 |
| Preparatory Costs | 23,233.90 |
| Profit | 75,044.63 |
| Less Payments Already Received | <u><242,790.00></u> |
| **Total** | <u>**$648,934.83**</u> |

AMC claims that it is additionally entitled to an award of attorney's fees, legal and accounting expenses (which have yet to be itemized), and prejudgment interest.

AMC argues that it has submitted documentation to BJC to establish that the costs incurred are allowable and associated with the Subcontract, and that BJC has never questioned whether these expenses were incurred in furtherance of the terminated Subcontract.

BJC argues, on the other hand, that AMC's recovery is limited to payment only for the work performed prior to the notice of termination. In support of its argument, BJC submits the Affidavit of Kevin Luthenauer [Doc. 57 Ex. 2], a Senior Construction Engineer with BJC and the Subcontract Technical Representative and Task Lead on the HRE Project. Attached to his affidavit is a Schedule of Quantities and Prices for the Task Release Agreement, which sets forth $1,777,000.00 as the total lump sum price for the "Subtotal Base Work" for the HRE Project. The Schedule then breaks down various line item totals, referred to as "Milestone Elements," and identifies a specific lump sum for each.

Luthenauer states in his affidavit that prior to the notice of termination, the only "Milestone Elements" on which AMC worked were the RDR/RAWP and Waste Handling Plan

(1.01a); Safety Basis Documentation (1.01b); Pre-Mobilization Standards (1.01c); Deactivation Plan and Verification (1.02a); and Readiness Review (1.02c). Luthenauer further states in his affidavit the percentage of completion for each of these items of work. Applying these percentages to the "Milestone Element" lump sum price for each item listed above, BJC argues that AMC would be entitled to a total payment of $338,612.50, calculated as follows:

| | | |
|---|---|---|
| RDR/RAWP/Waste Handling Plan | $200,000 x 100% = | $200,000 |
| Safety Basis Documentation | $50,000 x 50% = | $25,000 |
| Pre-Mobilization Standards | $60,000 x 90% = | $54,000 |
| Deactivation Plan and Verification | $185,000 x 29% = | $53,650 |
| Readiness Review | $53,000 x 11.25% = | $5,962.50 |

[Doc. 57 Ex. 2]. After deducting payments already made ($242,250.00), BJC contends that AMC is entitled to a maximum recovery of $96,362.50 for the HRE Project.

BJC argues that AMC is not entitled to recover any sums for any of the other items of work related to the HRE Project because AMC did not do any of this work. BJC further argues that even if the Subcontract had allowed for AMC to recover the costs it now claims, AMC has not maintained and provided sufficient documentation to BJC in order to support these costs. Finally, BJC argues that AMC is precluded from recovering severance costs or costs incurred in preparing the settlement claim because AMC failed to provide appropriate documentation to support these claims.

In its reply brief [Doc. 80], AMC argues that Luthenauer's calculations of the percentage of the contract are arbitrary determinations, and that his attempted calculation of the amount of the claim owed is not supported by either the contract terms or the Federal Acquisition

Regulations ("FAR").  Further, AMC contends that BJC has not disputed that AMC incurred direct

costs in the amount of $520,243.58, and therefore, after giving credit for payments received in the

amount of $242,790.00, AMC should be at a minimum entitled to a summary judgment for

$277,453.58.  Furthermore, because these undisputed costs were not paid upon the submission of

the first settlement proposal, AMC argues that it is entitled to pre-judgment interest, attorney's fees,

and profit on this amount.

### 1.        Limitations on AMC's Settlement Claim

The first issue for the Court to address is whether AMC's claim for settlement is

limited by the line item totals for the particular work actually performed, as suggested by BJC, or

whether the settlement claim is limited only by the overall Subcontract amount, as argued by AMC.

Upon careful review of the relevant contract language, federal regulations, and case law, the Court

concludes that the settlement claim is limited by the overall contract amount only.

The parties' agreement provides that the Subcontract shall be determined in

accordance with the federal law of government contracts.  See Subcontract, GC-4.  Accordingly, the

Court will look to federal law on this issue.

The interpretation of a contract is a question of law for the Court and therefore may

be resolved on summary judgment.  Blackstone Consulting Inc. v. United States 65 Fed. Cl. 463,

468 (2005).  When interpreting a contract, the Court must begin with the plain language.  Hunt

Constr. Group, Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002).  Where the parties

disagree as to the meaning of the words in the contract, the Court must determine whether an

ambiguity exists.  Blackstone, 65 Fed. Cl. at 468.  "A contract is ambiguous only when it is

susceptible to two reasonable interpretations." Hunt Constr., 281 F.3d at 1372 (quoting A-Transport

Northwest Co. v. United States, 36 F.3d 1576, 1584 (Fed. Cir. 1994)). "Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstances." United States v. Winstar Corp., 518 U.S. 839, 911 (1996). In ascertaining the parties' intent, the Court "must construe the contract to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." Blackstone, 65 Fed. Cl. at 469 (quoting M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004)).

Subsection C of the Termination Clause states that: "The Parties may agree on the amount to be paid because of the termination, however, the agreed amount shall not exceed the Subcontract price." The Court finds that the plain meaning of the term "Subcontract price" is the overall price of the Subcontract. While the term "Subcontract" is never specifically defined, the agreement refers to the parties' overall contract as the "subcontract." See, e.g., Subcontract, GC-1 ("This subcontract embodies the entire agreement between CONTRACTOR and SUBCONTRACTOR."). Given that usage, it is reasonable to interpret the term "Subcontract price" as referring to the overall price of the contract. The line item totals for specific work items, on the other hand, are referred to in the agreement as "Milestone Elements," and not "Subcontract prices." To construe these line item totals as constituting the "Subcontract price" is simply not a reasonable interpretation of the contract, and thus, the Court rejects BJC's proposed interpretation. Interpretation of the "Subcontract price" as the overall price of the Subcontract is consistent with the FAR, which provides that "[t]he total amount payable to the contractor for a settlement, before deducting disposal or other credits and exclusive of settlement costs, must not exceed *the contract price* less payments otherwise made or to be made under the contract." 48 C.F.R. § 49.207 (emphasis added); see also White Buffalo Constr., Inc. v. United States, 52 Fed. Cl. 1, 4 (2002)

(limiting contractor's recovery to the overall contract price less payments already made). Thus, while the line item amounts may be a factor in the determination of the reasonableness of the amount claimed by AMC, the Court concludes that AMC's total recovery is capped by the overall contract price less any payments already received, and not the total of certain line item amounts as BJC contends. Accordingly, the maximum that AMC could recover in this case would be $1,579,210.

### 2. Method of Calculation

Next, the Court must determine the manner in which to calculate AMC's recovery. The Subcontract provides that "SUBCONTRACTOR shall be paid for the Work performed prior to the notice of termination, plus reasonable charges for costs that would be allowable under FAR Part 31 that SUBCONTRACTOR can demonstrate to the satisfaction of CONTRACTOR, using its standard record keeping system, have resulted from the termination." Subcontract, GC-17. The term "Work" is defined in the Subcontract as "all duties and responsibilities to be performed by SUBCONTRACTOR as specified, stated, indicated, or implied by this Subcontract, including the furnishing and supervision of all technical personnel and labor and the supply of equipment, materials, and supplies necessary to perform this Subcontract." Subcontract, GC-2.

The Court of Federal Claims has held that "[w]hen a fixed-price contract is terminated for convenience, it is essentially converted into a cost reimbursement contract." White Buffalo Constr., 52 Fed. Cl. at 4 (citing Best Foam Fabricators, Inc. v. United States, 38 Fed. Cl. 627, 638 (1997) (citing Anlagen-und Sanierungstechnik GmbH, ASBCA No. 37,878, 91-3 B.C.A. ¶ 24, 128 at 120,753, 1991 WL 133253; Seven Science Industries, ASBCA No. 23,337, 80-2 B.C.A. ¶ 14,518, at 71,555, 1980 WL 2875; Caskel Forge, Inc., ASBCA No. 7638, 1962 B.C.A. ¶ 3318 at 17,108, 1962 WL 573)). Accordingly, a plaintiff is "entitled to recover all allowable costs incurred

in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination." White Buffalo Constr., 52 Fed. Cl. at 4; 48 C.F.R. § 52.249-2. "Which costs are allowed is determined by the cost principles set forth in FAR part 31, 'subject to the general principle that the contractor should be compensated fairly for the work terminated.'" White Buffalo Constr., 52 Fed. Cl. at 4.

In determining the allowability of costs, the Court may consider the following factors: "(1) reasonableness; (2) allocability to the contract; (3) generally accepted accounting principles and practices; (4) the terms of the contract; and (5) any specific limitations set forth in FAR part 31." White Buffalo Construction, 52 Fed. Cl. at 4 n.7; Best Foam Fabricators, 38 Fed. Cl. at 638-39; 48 C.F.R. § 31.201-2(a).

BJC argues that even if AMC were allowed to recover the costs for performing the work, AMC still would not be able to recover these costs because AMC has not maintained and provided sufficient documentation to support these costs. BJC further argues that AMC has not shown that the costs incurred were reasonable.

AMC counters that its documentation of costs was adequate, and that it has produced affirmative evidence, by way of the affidavit of Timothy Barker, to show that the costs incurred were for work actually performed on the HRE Project prior to the termination for convenience and that the costs were reasonable and necessary for the type of work being performed.

The FAR requires a contractor to maintain and provide adequate documentation of its costs. Specifically, 48 C.F.R. § 31.201-2(d) provides as follows:

> A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles

in this subpart and agency supplements. The contracting officer may
disallow all or part of a claimed cost that is inadequately supported.

The Court finds that there are genuine issues of material fact as to whether AMC maintained and

provided adequate records to demonstrate that its claimed direct costs were actually incurred,

allocable, and in compliance with applicable cost principles. In his affidavit, Mark Patrick states

that he has reviewed the documentation submitted by AMC in support of its claimed costs, and that

he discovered the following problems with that documentation:

> • Costs have not been adequately supported. Payroll records
> provided in claim for HRE project do not support payment amount
> stated by AMC for direct labor expenses incurred.
>
> • Labor hours do not agree with employee timecards or payroll
> records provided by AMC. Significant material discrepancies exist
> between employee timecards and payroll records regarding division
> of time between projects.
>
> • Time charged by Tim Barker does not appear to adequately
> consider indirect activities of a company president. Mr. Barker stated
> in the Audit Review Kick-off meeting on June 7, 2004 that ½ of his
> salary is charged against overhead and ½ of his salary is charged
> against the projects he supports; however, only a small percentage of
> his salary has been charged against overhead to date. Check No.
> 10824 issued to Mr. Barker on 06/02/2004 for pay period 4/30/2004
> – 5/30/2004, provided as Exhibit 8 of Letter from J. Brent Nolan to
> Reggie E. Keaton dated January 11, 2006, charges Mr. Barker's
> entire salary to the HRE project.
>
> • Payments were made to employees prior to the work being
> performed. Check Nos. 10623 and 10624 were issued to Karen
> Atchley and Kelly Smith on 03/31/2004 for Pay Period 4/19/04 –
> 4/25/04.

[Doc. 57 Ex. 2]. Additionally, Patrick states that AMC has not provided documentation, such as

indirect pool costs, to support its claim for indirect costs in connection with the HRE claim; that

AMC has not provided documentation to support the severance costs claimed, nor has it provided

any specific details regarding a severance policy; and that AMC has not provided specific documentation, such as time sheets or payroll records, to support the proposed preparation costs. [Id.]. The Court finds that this evidence at least creates an issue of fact as to whether AMC maintained and provided the required documentation to support its claims. Because AMC's claim for indirect costs is based on a calculation of its overall direct costs for the relevant time period, the Court finds that there are genuine issues of material fact regarding the amount of indirect costs to which AMC is entitled as well.

The Court further finds that there are genuine disputes as to the reasonableness of the costs incurred. Pursuant to the FAR, "[a] cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." 48 C.F.R. § 31.201-3(a). The costs incurred by a contractor are not afforded any presumption of reasonableness. Id. Rather, the Court must consider various factors, such as

> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>
> (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;
>
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
>
> (4) Any significant deviations from the contractor's established practices.

48 C.F.R. § 31.201-3(b).

As BJC points out, the costs claimed by AMC significantly exceed the "Milestone Element" prices for which AMC agreed to do the specific tasks identified in the Subcontract.

Comparing these line item prices for the items of work performed with the actual costs claimed by AMC, a reasonable factfinder could conclude that the claimed costs are not reasonable. Accordingly, summary judgment is not appropriate on this issue.

Because the reasonableness of the claimed costs is in question, so too is AMC's claim for profits. A claim for profits is not recoverable if it appears that the contractor was going to incur a loss on the completed project. 48 C.F.R. § 49.203. If AMC's costs indeed exceeded the "Milestone Elements" prices as set forth in the Subcontract, a fact question is presented as to whether AMC would have incurred a loss on the Subcontract and therefore would not be entitled to an award of profit.

With respect to AMC's claimed costs associated with the termination for convenience, namely severance costs and costs to prepare the claim, the Court finds that genuine issues of material fact exist as to whether AMC has provided adequate documentation to support these claims. Specifically, the Court notes that AMC has not provided evidence of its severance pay policy or any alleged severance pay agreement with its employees. See 48 C.F.R. § 31.205-6(g) (stating that severance pay is allowable only to the extent it is required by law, an employer-employee agreement, an established policy, or circumstances of the particular employment).

Finally, AMC requests that summary judgment be entered in its favor "on the issue of Defendant's failure to negotiate in good faith," particularly with respect to BJC's refusal to participate in mediation. The Court has already made a finding that BJC's refusal to participate in mediation was not in bad faith. [Doc. 56]. Accordingly, AMC's request for summary judgment on this issue is moot.

For these reasons, the Court concludes that there are numerous questions of fact as to whether the costs claimed by AMC are reasonable and allowable under the Subcontract. Accordingly, AMC's Motion for Partial Summary Judgment [Doc. 49] is **DENIED**.

IV.     <u>BJC'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT</u>

BJC moves the Court, pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure, to dismiss AMC's amended complaint for failure to state a claim upon which relief can be granted, or, in the alternative, to grant summary judgment dismissing the plaintiff's lawsuit. [Doc. 76].

A.     **Motion to Dismiss for Failure to State a Claim**

BJC states two bases for its motion to dismiss. First, BJC argues that AMC's original complaint and amended complaint seek to recover damages upon a sworn account and purport to rely upon an attached affidavit; however, neither complaint has a signed affidavit attached. Furthermore, BJC argues, it has become evident that AMC's claims "have nothing whatsoever to do with a sworn account." Second, with respect to AMC's breach of contract claims asserted in the amended complaint, BJC argues AMC's allegations do not meet the minimum requirement set forth under Rule 8 of the Federal Rules of Civil Procedure, as they are only conclusory statements that fail to give BJC notice of the basic events of which AMC complains.

AMC opposes BJC's motion, arguing that the defendant did not properly assert a Rule 12(b)(6) defense, and therefore, it has been waived. Furthermore, AMC argues that BJC did not object to AMC amending its complaint to assert breach of contract claims, and that BJC has been

placed on adequate notice regarding the specific contractual matters at issue in this litigation. [Doc. 101].

The Court agrees that to the extent that the plaintiff seeks to recover on a sworn account, the plaintiff's claim should be dismissed. A complaint on a sworn account must be supported by an affidavit proving the existence and correctness of the account. See Tenn. Code Ann. § 24-5-107; Hunter v. Anderson, 48 Tenn. 1 (1870) ("the complainant should, in his declaration, allege that the account is an account from another County or State, verified under this section of the Code, and make profert of such account in his declaration, in order that defendant may be informed of the nature of the cause of action against him, and be able to make the defense allowed by the statute") (interpreting predecessor of Tenn. Code Ann. § 24-5-107). In the present case, the plaintiff failed to support either the original complaint or the amended complaint with an affidavit concerning the existence and correctness of the account at issue. As such, the plaintiff's claim on a sworn account must fail, and BJC's motion [Doc. 76] , to the extent that it seeks dismissal of AMC's claim on a sworn account, is **GRANTED**.

With respect to the plaintiff's breach of contract claims, the Court finds that the defendant's motion to dismiss should be denied. "A Rule 12(b)(6) motion tests whether a cognizable claim has been pleaded in the complaint." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 435 (6th Cir. 1988). To state a cognizable claim, Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to set forth (1) a short and plain statement of the Court's jurisdictional basis for the claim; (2) a short and plain statement showing that the plaintiff is entitled to relief; and (3) a demand for judgment. Fed. R. Civ. P. 8(a). In reviewing a motion to dismiss under Rule 12(b)(6), the Court must take all of the factual allegations pleaded as true, and the

complaint "should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheid, 859 F.2d at 435 (quoting Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983)).[5]

AMC's amended complaint alleges that AMC entered into multiple contracts with BJC to perform services with respect to certain real property owned by the United States Department of Energy. AMC further alleges that it was either prevented from completing its obligations under the contract, or that the cost of performance to AMC was increased due to BJC's actions. AMC further alleges that it suffered a loss due to BJC's breach of contract. While the plaintiff's complaint is not incredibly detailed, the Court finds that AMC has sufficiently provided a short and plain statement showing that it is entitled to some kind of relief. Further, the Court finds that BJC has received adequate notice of the claims alleged. Accordingly, to the extent that BJC's motion seeks the dismissal of AMC's breach of contract claims under Rule 12(b)(6), the motion [Doc. 76] is **DENIED**.

### B. Motion for Summary Judgment

Next, BJC argues that it is entitled to summary judgment (1) on the HRE Project, limiting AMC's recovery to a maximum of $96,362.50; (2) on the requests for equitable adjustment ("REA") under the RASW Project; and (3) on AMC's claim for costs related to the Firewater Tower

---

[5]AMC argues that BJC did not properly assert a Rule 12(b)(6) defense in its earliest pleading, and therefore, the defense has been waived. The Court does not find that BJC failed to adequately preserve this defense. Moreover, a motion to dismiss for failure to state a claim upon which relief can be granted may be asserted in any pleading permitted under Rule 7(a), by a motion for judgment on the pleadings, or at the trial on the merits. See Fed. R. Civ. P. 12(h). Accordingly, the Court finds that plaintiff's argument on this issue to be without merit.

Project. For the following reasons, BJC's Motion for Summary Judgment [Doc. 76] must be **DENIED**.

### 1. HRE Project

BJC relies upon its opposition to AMC's Motion for Summary Judgment in support of its argument that AMC's recovery under the HRE Project should be limited to a maximum of $96,362.50. The Court has already found that AMC's recovery is not limited by the line item totals for the work performed and that genuine issues of material fact exist precluding summary judgment on AMC's claims related to the HRE Project. Accordingly, BJC's request [Doc. 76] for summary judgment on this issue is **DENIED**.

### 2. RASW Project

BJC argues that AMC has not met the contractual requirements for any of the REAs made under the RASW Project. BJC further argues that AMC failed to give BJC timely notice of its claims, and therefore, AMC is precluded from any recovery. AMC responds that genuine issues of material fact exist as to whether compensation is due under the RASW Project. Moreover, AMC argues that its claims for compensation were timely.

The Equitable Adjustment provision of the parties' Subcontract (GC-20)states as follows:

> A. Time is of the essence, and SUBCONTRACTOR'S REA must be submitted to CONTRACTOR within the schedule prescribed in the General Condition entitled "CHANGES", and/or the General Condition entitled "DIFFERING SITE CONDITIONS," and/or the schedule prescribed in the General Condition entitled "GOVERNMENT PROPERTY," as applicable. An adjustment in the price cannot be made until such time as SUBCONTRACTOR'S REA has been submitted to and accepted by CONTRACTOR, and negotiations have been completed.

B. The REA shall provide both a firm fixed-price proposal and narrative which, at a minimum, addresses the following items:

> 1. Entitlement to an equitable adjustment must be clearly stated citing the Subcontract clause(s)[;]
> 2. Line items that have been or may be affected;
> 3. Labor or materials or both that have been or may be added, deleted, or made obsolete;
> 4. Delays and disruptions in the manner and sequence of performance and the effect on continued performance that have been or may be encountered;
> 5. An estimate of adjustments to Subcontract price, delivery schedule, and other provisions that are affected;
> 6. SUBCONTRACTOR's costs incurred to date; and
> 7. An estimate of the time and costs required to complete the Work affected.

The narrative must be in a format to enable an independent third party to review and understand the proposal. Pricing and/or cost data shall be supplied in a manner and level requested by CONTRACTOR to support the fixed-price proposal. SUBCONTRACTOR subsequently shall not be entitled to increase the value of the REA to address elements of cost or impact that were not included with the REA.

C. An equitable adjustment in the schedule and/or the Subcontract price will be allowed only if: (1) SUBCONTRACTOR has complied with the requirements of the General Conditions entitled "CHANGES," "DIFFERING SITE CONDITIONS," and/or "GOVERNMENT PROPERTY," as applicable; and (2) the REA was submitted within the time allotted. SUBCONTRACTOR shall waive its right for adjustment if it fails to comply with the instructions provided herein.

General Condition 18, entitled "Changes," states, in pertinent part, as follows:

> SUBCONTRACTOR must assert its right to an adjustment under this clause in writing within 10 days from the date of receipt of the written order. However, if CONTRACTOR decides that the facts justify it, CONTRACTOR may receive and act upon a proposal submitted before final payment of the Subcontract.

SUBCONTRACTOR must submit a proposal for equitable adjustment in accordance with the General Condition entitled "EQUITABLE ADJUSTMENT" within 20 days of the written assertion in the above paragraph. If SUBCONTRACTOR's proposal includes the cost of property made obsolete or excess by the change, CONTRACTOR shall have the right to prescribe the manner of the disposition of the property.

*     *     *

Any other written or oral order (which as used in this paragraph includes direction, instruction, interpretation, or determination) from CONTRACTOR that SUBCONTRACTOR alleges cause a change may be treated as a change order under this clause, provided that SUBCONTRACTOR gives CONTRACTOR written notice within 5 days of the action stating (1) the date, circumstances, and source of the order and (2) that SUBCONTRACTOR regards the order as a change. SUBCONTRACTOR must submit a proposal for equitable adjustment in accordance with the General Condition entitled "EQUITABLE ADJUSTMENT" within 20 days of the written notice.

In support of its motion, BJC submits the affidavits of David Hill, George Parkhurst, Woody Byars, and Mark Patrick. David Hill, the Subcontract Administrator for BJC, states in his affidavit that with respect to REA No. 1, BJC never directed the change for which AMC requests compensation; that the change in question was a change requested by AMC in order to save costs; and that AMC has never shown how it incurred additional costs as a result of this change in the work. With respect to REA No. 3, Hill states that AMC is requesting compensation for performing work in accordance with the AMC work plan; that there was no change in the work; and that AMC has never shown how it incurred additional cost. Finally, with respect to REA No. 4, Hill states that AMC has never shown how it incurred additional cost as a result of any change that is the subject of this REA. [Doc. 77].

George Parkhurst, the Manager of Internal Audit for BJC, states in his affidavit that he performed a review of records submitted by AMC in support of the RASW Project and

24

determined that the REAs were inadequate for the review due to inadequate documentation. Specifically, Parkhurst notes that "[c]laimed costs were not clear and did not have explanations and documentation to support those costs." With respect to REA No. 5, Parkhurst states that the labor hours have not been reconciled and do not agree with the employee timecards or with other support schedules provided by AMC. Although BJC requested an explanation, Parkhurst states that no explanation was received. [Doc. 57 Ex. 4].

In his affidavit, Woody Byars, the Subcontractor Coordinator for BJC, states that AMC has not presented information to show that there were any additional costs to which AMC was entitled with respect to REA No. 6. [Doc. 79].

BJC Lead Subcontract Administrator Mark Patrick states in his affidavit that AMC's notices of REA Nos. 1, 3, and 4 were not provided to BJC until months after the work alleged to have been the basis for the REAs was performed.[6] [Doc. 84].

AMC responds that it initially filed a REA on the RASW Project on or about December 3, 2003, which was then divided by BJC into four separate REAs. BJC paid for REA No. 2, and it is therefore not in dispute. AMC argues that material facts exist with respect to the scope of the work and the requirements of REA No. 3, which was for additional grout around the base of the containers. AMC contends that the original work plan required only backfill soil, not grout, but

---

[6]Patrick also states in his affidavit [Doc. 84] that BJC also denied a REA by AMC for the premium for obtaining insurance for pollution liability coverage for the RASW Project, because the Subcontract already required such coverage because AMC was going to be working with hazardous substances, such as radioactive materials. AMC's counsel stated at the summary judgment hearing that AMC has withdrawn its request for reimbursement of this insurance premium. Accordingly, this REA is no longer at issue.

that AMC was required by BJC to place additional grout around the base of the containers, thereby incurring additional costs.

AMC further contends material facts exist with respect to REA No. 4. AMC President Timothy Barker states in his third affidavit that the expenses incurred with regard to this request were well documented in an Excel spreadsheet provided to BJC on January 16, 2004. [Doc. 101 Ex. 1].

With respect to REA No. 5, AMC argues that genuine issues of material fact also exist because Barker states in his affidavit, contrary to Parkhurst's assertions, that AMC has provided all responsive documents requested by BJC with regard to this request. AMC further argues that genuine issues of material fact exist as to REA No. 6. In his affidavit, Barker states that this work was performed and an invoice in the amount of $45,091.95 was submitted. After receiving payment of $18,372.87, AMC was instructed to submit the balance as REA No. 6. Barker states that AMC has submitted numerous documents in response to the issues raised by BJC with regard to this request. Finally, AMC argues that there is a genuine dispute as to whether its claims were timely. AMC relies again on Barker's third affidavit, in which he states that the work was ongoing at the time the REAs were submitted and that the work was not completed until December 19, 2003.

Upon reviewing the competing affidavits submitted by the parties, the Court agrees with the plaintiff that there are numerous genuine issues of material fact as to whether AMC is due any compensation under the terms of the Subcontract for the REAs submitted with regard to the RASW Project. Accordingly, to this extent, BJC's Motion for Summary Judgment [Doc. 76] must be **DENIED**.

### 3. Firewater Tower Project

Finally, BJC argues that it is entitled to summary judgment with respect to the plaintiff's claims for payment related to the Firewater Tower Project. AMC seeks to be paid for costs incurred for revising documents for this Project. AMC's claim is for a total of 537 hours for these revisions. In support of its motion, BJC offers the affidavit of Patrick Mullen [Doc. 78], a Senior Scientist/Subcontract Coordinator with BJC, who states that, based upon his knowledge and experience, these revisions should have taken no more than 50 hours. Accordingly, BJC argues, that it is entitled to summary judgment limiting AMC's claim to 50 hours. BJC also seeks summary judgment on AMC's claim for costs related to the delay of the start date for felling the Firewater Tower. In support of this argument, BJC relies upon the affidavit of George Parkhurst, which details the problems he discovered with AMC's documentation for this claim. [Doc. 57 Ex. 4].

AMC responds that genuine issues of material fact exist with respect to the Firewater Tower Project. Specifically, AMC notes that Mullen's affidavit addresses only one aspect of the claim, the revisions, and that AMC has since supplemented the records for the revisions, the suspension and the standpipe changes. AMC further argues that Parkhurst's analysis of its claim is flawed. AMC claims that it has provided all time records and records of expenses relevant to the claim. As such, AMC argues, summary judgment should be denied.

The Court finds that the affidavits of Barker and Parkhurst present genuine issues of material fact precluding summary judgment on AMC's claim related to the Firewater Tower Project. Accordingly, BJC's request [Doc. 76] for summary judgment on this issue must also be **DENIED**.

## V. NANB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In support of its Motion for Partial Summary Judgment [Doc. 61], NANB argues that it has absolute priority over Pro2Serve because NANB holds a perfected security interest that pre-dates Pro2Serve's equitable lien and because Pro2Serve has not proven that it has any priority under the Prompt Pay Act of 1991, Tenn. Code Ann. § 66-34-101, *et seq*. NANB further argues that it has absolute priority over CALBT, except to the limited extent that NANB's priority was subordinated by agreement on the HRE Project. Because no party has asserted a superior claim on the other two projects at issue – the RASW Project or the Firewater Tower Project – NANB contends that it has an undisputed first priority interest in any recovery by AMC on those projects. [Doc. 66].[7]

Pro2Serve opposes NANB's motion, arguing that there are a number of disputed issues of material fact which preclude an award of summary judgment to NANB. Pro2Serve further contends that whether NANB has a perfected security interest is not relevant because the funds claimed by Pro2Serve are not the property of AMC. Pro2Serve argues that the Prompt Pay Act applies in this case to the funds held by BJC, and therefore, Pro2Serve's claim for payment has priority over the Bank as a secured creditor. [Doc. 91].

In reply, NANB argues that it has a right to recover funds directly from Bechtel Jacobs; that the Prompt Pay Act never became applicable to give Pro2Serve a protected interest in the funds held by BJC, and that even if the funds were to come into the possession of AMC, NANB is entitled to priority over Pro2Serve because it has a prior perfected security interest. [Doc. 102].

**A.     Facts**

---

[7]AMC filed a response to NANB's motion, stating that AMC does not dispute NANB's claim of priority over the claim of Pro2Serve. [Doc. 92]. Neither CALBT nor Pro2Serve challenge NANB's claim of priority with respect to the RASW or Firewater Tower Projects.

On January 27, 1999, AMC executed a Promissory Note to NANB for Loan Number 1024140001. AMC's obligation to NANB under the Promissory Note was renewed, and the principal amount due was revised several times (except with respect to one of these renewals), with the last renewal occurring on September 21, 2005. NANB and AMC also executed a Commercial Security Agreement for Loan Number 1024140001 on January 27, 1999. As with the Promissory Note, AMC's obligation under the Commercial Security Agreement was periodically renewed between January 27, 1999 and September 21, 2005.

To secure the Commercial Security Agreement, AMC pledged certain collateral to NANB, including all of AMC's inventory, accounts, equipment, and the proceeds thereof. NANB perfected its security interest in the collateral on June 10, 1999 by filing a UCC-1 Financing Statement.[8] NANB also filed a UCC-1 Continuation Statement of the Financing Statement on April 22, 2004.

In support of its motion, NANB has submitted the affidavit of James A. Walker, Jr., the president of NANB. Walker states that during the life of the NANB loan, AMC has failed to pay the principal and/or interest due on the Promissory Note on several occasions, and that consequently, NANB believed itself to be insecure on numerous occasions. Walker further states that a recent event of default occurred under the Promissory Note when AMC failed to make its required August 5, 2005 payment in a timely manner. As a result of this default, Walker states that NANB determined that it was necessary to take proper actions to increase its security by formally placing AMC in default under the Promissory Note and pursuing its contractual remedies. Walker further

---

[8]NANB filed the financing statement in the Office of the Clerk of Court of Gwinnett County, Georgia, the county where AMC maintains its principal place of business. See Ga. Code Ann. § 11-9-501(a)(2).

states that since the date of the default, AMC paid some of the amounts due and owing to NANB, but for purposes of this litigation, AMC's default occurred as of its initial failure to perform as required under the Promissory Note, and AMC has not yet cured NANB's belief that it remains insecure. Walker states that NANB has learned that AMC has ceased conducting business and that AMC has previously advised NANB that it cannot pay the balance of its loan out of the funds currently in AMC's possession. The principal loan amount of $222,916.74, plus all accrued unpaid interest, remains past due, owing, and unpaid. [Doc. 66 Ex. 2].

### B. NANB's Entitlement to Proceeds

Pro2Serve contends that there are numerous questions of fact which preclude a grant of summary judgment to NANB. Specifically, Pro2Serve argues that there are numerous disputes with respect to whether AMC is in default on its obligations to NANB. AMC has filed a response to NANB's motion, supporting NANB in its claim of priority over the claim of Pro2Serve. [Doc. 92]. AMC does not oppose NANB's claim of entitlement to AMC's proceeds. As such, it does not appear to the Court that there are any genuine issues of material fact between AMC and NANB as to whether NANB is entitled to enforce its security interest in any of the collateral pledged by AMC. Accordingly, the Court finds Pro2Serve's argument with respect to this issue to be without merit.

### C. NANB's Priority Over Pro2Serve

NANB first argues that it has had a perfected security interest in AMC's inventory, accounts, equipment, and the proceeds thereof, since June 10, 1999, and that this perfected security interest is superior to the unsecured equitable lien claimed by Pro2Serve. NANB further argues that Pro2Serve is not entitled to any priority pursuant to the Prompt Pay Act because (1) Pro2Serve has

failed to demonstrate that it performed work in accordance with the provisions of its written contract with AMC; (2) there is no proof that AMC has received funds for Pro2Serve's work, services, equipment, or materials or that AMC is wrongfully withholding funds from Pro2Serve; (3) Pro2Serve has failed to comply with the notice requirements of the Prompt Pay Act; and (4) the Prompt Pay Act is expressly inapplicable to banks.

While not disputing that NANB has obtained a perfected security interest, Pro2Serve argues that this is irrelevant because a perfected security interest in accounts does not defeat the claim of an unpaid subcontractor to contractor funds under the Prompt Pay Act. Pro2Serve further argues that the Prompt Pay Act is applicable in this case because (1) it is undisputed that all work performed by Pro2Serve for which Pro2Serve submitted invoices to AMC and for which Pro2Serve requested compensation was necessary for the performance of Pro2Serve's subcontract with AMC, was performed correctly, and was accepted by AMC; (2) the construction fund doctrine applies even to funds that have not yet been delivered to the contractor; (3) Pro2Serve complied with the statutory notice requirements; and (4) the bank exception to the Prompt Pay Act is inapplicable under the circumstances of this case.

Assuming for the moment that Pro2Serve is entitled to payment under the Prompt Pay Act (the Court will address Pro2Serve's entitlement to such payment while addressing Pro2Serve's motion for summary judgment below), the real issue for the purpose of NANB's motion for partial summary judgment becomes whether the Prompt Pay Act operates to give Pro2Serve a superior interest in the proceeds of the litigation between AMC and BJC. The Prompt Pay Act provides, in pertinent part, as follows:

> Performance by a subcontractor, materialman or furnisher in accordance with the provisions of such person's written contract with

a contractor for improvement of real property shall entitle such person to payment from the contractor.

Tenn. Code Ann. § 66-34-301.  The Act goes on to provide as follows:

> Any sums received by the contractor as payment for work, services, equipment and materials supplied by the subcontractor, materialman or furnisher for improvements to real property shall be held by the contractor in trust for the benefit and use of such subcontractor, materialman or furnisher and shall be subject to all legal and equitable remedies.

Tenn. Code Ann. § 66-34-304.[9]  However, the Prompt Pay Act also explicitly provides that its provisions "do not apply to any bank, savings bank, savings and loan association, industrial loan and thrift company, other regulated financial institution or insurance company."  Tenn. Code Ann. § 66-34-703.

NANB contends that the Prompt Pay Act is rendered inapplicable in this case by operation of section 66-34-703.  Pro2Serve counters that NANB misunderstands the purpose of this section.  In so arguing, Pro2Serve relies upon the transcripts of the legislative discussion and debate relating to the amendment of the Prompt Pay Act to add section 66-34-703.  Pro2Serve argues that these discussions make clear that the purpose of the exclusion of banks and other financial institutions from the provisions of the Prompt Pay Act was based upon the legislature's intent to avoid creating a fiduciary duty between construction lenders and remote subcontractors and suppliers and to avoid imposing liability upon construction lenders for the misapplication of contract funds.

---

[9]The Prompt Pay Act is equally applicable to a contract between subcontractors.  See Tenn. Code Ann. § 66-34-401.

NANB argues, on the other hand, that the express language of the statute speaks for itself. Moreover, NANB argues that the legislative history of the Prompt Pay Act does not support Pro2Serve's position. At best, NANB contends, these transcripts are ambiguous, and there is no indication that the avoiding of creating a fiduciary obligation on the part of banks was the sole reason for the introduction or passage of the statute.

There is a dearth of case law in Tennessee on the Prompt Pay Act; the few cases that have been decided pursuant to the Act primarily involve the award of attorney's fees to a contractor or subcontractor for the wrongful withholding of payment. To the Court's knowledge, no Tennessee Court has interpreted section 66-34-703. In the absence of any controlling authority from the Tennessee Courts on the interpretation of the Prompt Pay Act, the Court must make its best prediction of what the Tennessee Supreme Court would do if it were confronted with the issue. In doing so, the Court "may rely upon analogous cases and relevant dicta in the decisional law of the State's highest court, opinions of the State's highest court, opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of State Supreme Court direction, and persuasive opinions from other jurisdictions, including the 'majority rule.'" Welsh v. United States, 844 F.2d 1239, 1245 (6th Cir. 1988) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)).

The role of the Court in interpreting a statute "is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). The legislative intent "is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" Clark v. Lowe's

Home Centers, ___ S.W.3d ___, 2006 WL 2439736, at *2 (Tenn. Aug. 24, 2006) (quoting State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000)). Where the language of the statute is clear and unambiguous, the Court applies the plain language of the statute in its "normal and accepted use." City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey, 126 S.W.3d 897, 902 (Tenn. 2004) (quoting Boarman v. Jaynes, 109 S.W.3d 286, 291 (Tenn. 2003)).

 Section 66-34-703 provides that the provisions of the Prompt Pay Act "do not apply to any bank . . . ." The words chosen by the Legislature are admittedly broad, but the Court cannot say that the scope of this language renders its meaning unclear or ambiguous. To the contrary, the Court finds the statute to be quite clear: the plain language of this statute prohibits the application of the Prompt Pay Act to any bank, and it therefore follows that any rights afforded to contractors under the Act cannot affect the rights of a bank or other financial institution. Had the Legislature wanted to limit the protection afforded to banks under this provision, it certainly could have done so. Instead, however, by using this broad, all-inclusive language, it appears to the Court that the Legislature chose to remove banks entirely from the purview of the Act. The Court "must 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" Mooney v. Sneed, 30 S.W.3d 304, 307 (Tenn. 2000) (quoting BellSouth Telecomm., Inc. v. Greer, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

 The Texas Supreme Court addressed a similar statutory provision in RepublicBank Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605 (Tex. 1985). In that case, the general contractor borrowed money from RepublicBank ("Bank") and secured its debts by its accounts receivable. Id. at 606. When the general contractor defaulted on the loan, the Bank brought suit to collect the indebtedness and in so doing, obtained an injunction preventing the general contractor from paying

portion of its accounts receivable to Interkal, which had provided materials to the general contractor. The trial court found that Interkal had a superior right to the funds pursuant to the Texas builders' trust fund statute, Tex. Rev. Civ. Stat. Ann. art. 5472e. Id. The Bank argued that it had a superior right to the funds pursuant to its perfected security interest, and it relied upon section 4 of art. 5472e, which provided that the "Act shall have no application to any bank, savings and loan association or other lender or in any title company or other closing agent in connection with any transaction to which this Act is applicable." Id. The Texas Court of Appeals concluded that section 4 was intended only to protect lenders from criminal charges arising out of the receipt or disbursement of money that could be construed as trust funds under the Act; it therefore held that the Act was applicable, and that Interkal had a superior right to the funds at issue. Id. at 607.

While agreeing with the Court of Appeals that lien statutes should be liberally construed for the purpose of protecting laborers and materialmen, the Texas Supreme Court noted that it "cannot be blind to the plain language of section 4, which provides that the act shall not have application to any bank." Id. Consequently, under the plain language of the statute, the Supreme Court concluded that the Act was inapplicable to the Bank's security interest and therefore, the Bank had priority as a secured creditor over Interkal's claim under the Act. Id. at 607-08.

The Court finds the rationale of Interkal to be persuasive in the instant case. Like the statutory language at issue in Interkal, the plain language of Tenn. Code Ann. § 66-34-703 is clear and unambiguous. The statute clearly provides that the provisions of the Prompt Pay Act "do not apply to any bank . . . ." The Court, therefore, concludes that under the plain language of section 66-34-703, NANB's priority as a secured creditor is not affected by the provisions of the Prompt Pay Act.

Having found the statute to be clear and unambiguous, the Court need not look beyond the plain language itself for the statute's meaning. See Bowden v. Memphis Bd. of Educ., 29 S.W.3d 462, 465 (Tenn. 2000) (noting that court may look elsewhere to ascertain legislative intent where statutory language is reasonably capable of more than one meaning). Indeed, because the statutory language is clear, the Court is precluded from doing so. "If the words of a statute plainly mean one thing they cannot be given another meaning by judicial construction." Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 803 (Tenn. 2000) (quoting Henry v. White, 194 Tenn. 192, 198, 250 S.W.2d 70, 72 (1952)). Even if the Court did consider the legislative history cited by Pro2Serve, however, the Court finds the legislative history to be unpersuasive. At best, the cited transcripts are ambiguous. While it does appear that one of the motivations for the passage of section 66-34-703 was to relieve banks from the fiduciary obligation to hold funds in trust, there is no indication that this was the only reason for the amendment. Indeed, as Senator Cooper, one of the sponsors of the bill, noted, the amendment "would eliminate any bank, savings bank, savings and loan association, industrial loan and thrift company, and other regulated financial institution or insurance company from [the Prompt Pay Act]." [Doc. 99 Ex. 1 at 3].

In sum, had the Legislature intended to exempt banks only from the fiduciary obligation of the Prompt Pay Act as suggested by Pro2Serve, it could have done so. The broad scope of section 66-34-703 suggests that the Legislature did not so intend, but rather intended to exempt banks from all of the Prompt Pay Act. Accordingly, the Court concludes that the Bank's priority as a secured creditor remains unaffected by Pro2Serve's claim under the Prompt Pay Act.

D.      **NANB's Priority Over CALBT**

Next, NANB argues that CALBT, by its own admission, did not perfect its security interest in AMC's accounts, or the proceeds thereof, until December, 2004. Because NANB had a prior perfected security interest in the accounts and other collateral of AMC, NANB argues that it has absolute priority over CALBT on this collateral. See Ga. Code Ann. § 11-9-322. NANB concedes that, with regard to the HRE Project, NANB agreed to subordinate its security interest in favor of CALBT, and accordingly, CALBT is entitled to recover before NANB with regard to amounts recovered by AMC for the HRE Project, to the extent that such funds are covered by the terms of the Intercreditor and Subordination Agreement between NANB and CALBT.

CALBT has not opposed this portion of NANB's motion, and it does not appear that there is any genuine issue of material fact with respect to this issue. Accordingly, this portion of NANB's motion [Doc. 61] shall be **GRANTED**.

### E.      Conclusion

For the foregoing reasons, Intervening Plaintiff North Atlanta National Bank's Motion for Partial Summary Judgment [Doc. 61] is **GRANTED**. The Court finds that NANB is a perfected secured party with priority over the claim of Pro2Serve with respect the HRE Project, and that NANB is a perfected secured party with priority over CALBT with respect to the RASW and Firewater Tower Projects. The Court further finds that NANB is entitled to the proceeds of the litigation between AMC and BJC, if any, in the amount of $222,916.74, plus all accrued unpaid interest.


## VI.      CALIFORNIA BANK & TRUST'S MOTION FOR SUMMARY JUDGMENT

CALBT moves for a judgment as a matter of law with respect to (1) the liability of AMC on the loan agreements with CALBT; (2) the priority between CALBT and NANB as to the proceeds due to AMC from BJC regarding the HRE Project; and (3) the priority between CALBT and Pro2Serve as to the proceeds due to AMC from BJC. [Doc. 68].

AMC has filed a response [Doc. 98], supporting CALBT's position that it has priority over Pro2Serve over any funds collected by AMC as to the HRE Project after payment of AMC's attorney fees and expenses incurred in the prosecution of this cause. While AMC does not dispute the amount sought by CALBT, it does dispute the per diem rate sought by CALBT.

Pro2Serve opposes CALBT's motion, arguing that CALBT had no interest in any accounts receivable of AMC relating to the HRE Project until after Pro2Serve completed the performance of its work and after AMC's contract with BJC was terminated for convenience on September 7, 2004. Pro2Serve further argues that the Prompt Pay Act is applicable to this action, and therefore, Pro2Serve's claim under the Act has priority over CALBT's secured interest in AMC's collateral. [Doc. 99].

## A. Facts

In support of its motion, CALBT submits the affidavit [Doc. 82] of its Vice-President and Senior Loan Administrator, Gregory Coler. Coler's affidavit states the following facts. On November 18, 2003, AMC and CALBT entered into a Business Cashline SBA Express Term Loan Agreement ("Loan Agreement"). On November 10. 2004, the Loan Agreement was amended to change the maturity date from December 1, 2010 to March 1, 2005, to provide monthly interest only payments to March 1, 2005, and to collateralize the Loan Agreement by granting CALBT a security interest in the accounts receivable due AMC from BJC. The Loan Agreement, as amended, is

constituted by incorporation of the Loan Agreement along with a Change in Terms Agreement dated November 10, 2004, a Corporate Resolution to Borrow/Grant Collateral dated November 10, 2004, and a Commercial Security Agreement dated November 10, 2004 (collectively "Amended Loan Agreement").

On December 2, 2004 and December 20, 2004, CALBT recorded UCC Financing Statements, perfecting its security interest in AMC's receivables. Thereafter, CALBT entered into an Intercreditor and Subordination Agreement with NANB, which had a superior lien on the receivables as well as other AMC assets. The Intercreditor and Subordination Agreement subordinates NANB's security interest in the receivables from the HRE Project.

On March 31, 2005, AMC and CALBT entered into a Change in Terms Agreement, whereby the maturity date of the Amended Loan Agreement was extended to July 1, 2005 and whereby AMC was required to make interest only payments beginning April 11, 2005 and on the 11th of each month thereafter until maturity ("Second Amended Loan Agreement"). The Second Amended Loan Agreement has matured, but AMC has failed and refused to pay the amounts due and owing under the Second Amended Loan Agreement and has otherwise failed to honor its obligations under the Second Amended Loan Agreement. As of May 26, 2006, the total due and owing to CALBT by AMC under the Second Amended Loan Agreement for principal and interest is $147,674.29, which amount increases daily at the rate of $37.4162083.[10]

_____

[10]In its brief, CALBT identifies the total amount owed as $146,617.27 and the daily rate of interest as $31.803771; however, Coler's affidavit states that the total amount owed is $147,674.29 and that the daily rate of interest is $37.4162083. AMC does not dispute the loan balance stated in CALBT's brief but does not address the figure stated in Coler's affidavit. Further, while AMC disputes CALBT's calculation of the rate of interest cited in its brief, it does not address the rate of interest cited by Coler in his affidavit. AMC refers the Court to the terms of the loan agreement for the correct rate of interest. [Doc. 98]. The Second Amended Loan

The Second Amended Loan Agreement provides that upon default or upon the commencement of any action which may materially affect CALBT's interest in the receivables, AMC is obligated to pay CALBT its attorneys' fees and expenses associated with collecting the debt and protecting its interest in the receivables. Accordingly, CALBT contends, it is entitled to a judgment against AMC in the amount of the balance of the loan, plus interest from May 26, 2006 to the present, plus its attorneys' fees and expenses.

**B.  Recovery Against AMC**

As noted previously, AMC does not dispute the loan balance sought by CALBT. The undisputed evidence, as established by the affidavit of Gregory Coler, is that the loan balance as of May 26, 2006 is $147,674.29. AMC does, however, dispute the per diem rate of interest claimed. The affidavit of Gregory Coler states that the applicable daily rate is $37.4162083. The Second Amended Loan Agreement simply provides for a rate of interest of 8%. [Doc. 82 Ex. E]. Accordingly, the Court will award CALBT a judgment against AMC in the amount of $147,674.29, plus interest from May 26, 2006 at the rate of 8%, plus an award of reasonable attorneys' fees and expenses.

**C.  Priority over NANB**

CALBT argues that pursuant to the Intercreditor and Subordination Agreement, it has priority over NANB with respect to the receivables from the HRE Project. NANB does not dispute CALBT's position, and accordingly, summary judgment will be entered in CALBT's favor on this issue.

**D.  Priority over Pro2Serve**

---

Agreement provides for a rate of interest of 8%. [Doc. 82 Ex. E].

In arguing that it has priority over Pro2Serve, CALBT argues that the Prompt Pay Act is not applicable to this action. For the reasons stated herein, the Court finds that CALBT's priority as a secured creditor is unaffected by Pro2Serve's claim under the Prompt Pay Act.

### E.    Conclusion

For the foregoing reasons, the Motion by California Bank & Trust for Summary Judgment [Doc. 68] is **GRANTED**. The Court finds (1) CALBT is entitled to a judgment against AMC in the amount of $147,674.29, plus interest from May 26, 2006 at the rate of 8%, plus an award of reasonable attorneys' fees and expenses; (2) that CALBT has priority over NANB as to the proceeds, if any, due to AMC from BJC regarding the HRE Project; and (3) that CALBT has priority over Pro2Serve as to the proceeds due to AMC from BJC.

## VII.    PRO2SERVE'S MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, Pro2Serve argues that it is entitled to a judgment as a matter of law: (1) against AMC for $299,156.42 for payment for work performed by Pro2Serve pursuant to its subcontract with AMC; (2) that it is entitled to an equitable lien against the balance of the contract funds withheld by BJC from AMC on the HRE Project; and (3) that Pro2Serve's interest in such funds has priority over the claims of CALBT and NANB. [Doc. 71].[11]

The Court has already determined that CALBT and NANB are entitled to priority over any claim that Pro2Serve might have under the Prompt Pay Act. Accordingly, the Court need not address this issue further. The Court will focus instead on the two remaining issues raised by

---

[11]Pro2Serve states in its motion that it does not move for summary judgment on its claim for recovery of attorney's fees from AMC pursuant to the Prompt Pay Act, but reserves the right to file such a motion upon completion of discovery on that issue. [Doc. 71].

Pro2Serve, namely, whether Pro2Serve is entitled to a judgment as a matter of law on the amount of payment for work performed and whether Pro2Serve has satisfied the requirements of the Prompt Pay Act. Because the Court finds that there are genuine factual disputes with respect to both of these issues, the Motion for Partial Summary Judgment by Intervening Plaintiff Professional Project Services, Inc. [Doc. 71] is **DENIED**.

A.      **Facts**

In support of its motion for summary judgment, Pro2Serve has submitted the affidavit [Doc. 74] of Douglas Allen, Vice President and Environmental Division Manager of Pro2Serve, which establishes the following facts. On October 30, 2003, Pro2Serve entered into a Subcontract with AMC for the performance of a portion of the work on the HRE Project under AMC's contract with BJC. The scope of work for Pro2Serve's Subcontract consisted of project planning and design – including RDR/RAWP and waste handling plans, safety basis submittals, and pre-mobilization submittals – and demolition activities, including a deactivation plan and verification and field support. Pro2Serve performed work under the Subcontract from October 31, 2003 to September 7, 2004. Allen states in his affidavit that, with the exception of field support for demolition activities, Pro2Serve completed performance of work pursuant to its Subcontract; that Pro2Serve completed such work in accordance with the provisions of its Subcontract, prior to September 7, 2004; and that AMC accepted the work performed by Pro2Serve pursuant to its Subcontract.

Prior to September 7, 2004, Pro2Serve submitted two invoices to AMC for work performed under the Subcontract. AMC did not dispute the amount of payment requested in Pro2Serve's invoices, and did not question the statement of work completed on either invoice. AMC

made a partial payment to Pro2Serve of $135,000.00 for work performed prior to September 7, 2004.

After AMC's contract with BJC was terminated for convenience, Pro2Serve prepared and submitted a total cost basis settlement proposal for a net payment of $299,156.42, representing the total cost of $394,687.65, plus profit of $39,468.72, with a credit for payment of $135,000.00. Allen states that all work performed by Pro2Serve for which Pro2Serve submitted invoices to AMC and for which Pro2Serve requested compensation through its Settlement Proposal was necessary for the performance of Pro2Serve's subcontract with AMC, was performed correctly, and was accepted by AMC. Pro2Serve further relies upon the affidavit of AMC President Timothy Barker, which was submitted in support of AMC's motion for summary judgment, in which Barker states as follows:

> 14. AMC has incurred direct expenses to subcontractors. Each of the subcontractors outlined herein below have extensive work histories with BJC both before and after the termination for convenience at issue in this cause. They are industry leaders in their respective fields of work. All of the work identified by these subcontractors was in furtherance of the HRE contract.
>
> 15. Each of the invoices outlined herein below from subcontractors was for work actually performed on the HRE contract prior to receipt of the termination for convenience and are reasonable and necessary for the type of work being performed.
>
> 16. Pro2Serve has submitted a claim against AMC indicating work performed on behalf of AMC in the furtherance of this contract in the amount of $434,156.42.
>
> 17. AMC paid Pro2Serve $135,000.00 for work performed and Pro2Serve is currently seeking a balance of $299,156.42 from AMC.

[Doc. 50, Barker Aff., ¶¶ 14-17].

### B. Analysis

Pro2Serve argues that the undisputed facts establish that it performed the work under the Subcontract for which it seeks payment, that AMC accepted the work of Pro2Serve, and that upon the termination for convenience, Pro2Serve submitted its claim for the actual cost of work performed plus profit, as provided in the Subcontract.[12]  Accordingly, Pro2Serve contends, it is entitled to an award of $299,156.42.

While AMC does not dispute that the work performed by Pro2Serve was necessary and in furtherance of the contract, AMC asserts that it has incurred damages as a result of the delay in the performance of the work performed by Pro2Serve. [Doc. 24, Answer to Intervening Complaint ¶8 and ¶1 of the Affirmative Defenses].  AMC relies upon the Second Affidavit of Timothy Barker, which states that BJC has indicated that there were problems with the submittals prepared by Pro2Serve with respect to the work it performed on the HRE Project, and that to the extent that BJC indicates that the submittals were not acceptable, such submittals would not be in compliance with the subcontract.  Barker further states that Pro2Serve was late in providing the necessary submittals that eventually led to increased overhead on the part of AMC and substantial damages to AMC because of these failures.  Finally, Barker asserts that Pro2Serve did not comply with all of its subcontract requirements concerning the performance of its work. [Doc. 94 Ex. 1].

The Court finds that there are genuine issues of material fact as to whether Pro2Serve is entitled to payment in the amount of $299,156.42 for the work it performed on the HRE Project.

---

[12]The Subcontract between AMC and Pro2Serve provides that, in the case of a termination for convenience, Pro2Serve "shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." [Doc. 74, Allen Aff. Ex. 1 at 9].

Accordingly, Pro2Serve's motion must be denied on this issue. Because there are genuine issues of material fact as to whether Pro2Serve performed the work in accordance with its contract, the Court must **DENY** Pro2Serve's motion [Doc. 71] with respect to its entitlement to an equitable lien under the Prompt Pay Act as well. See Tenn Code Ann. § 66-34-301 ("Performance by a subcontractor . . . *in accordance with the provisions of such person's written contract* with a contractor for improvement of real property shall entitle such person to payment from the contractor.") (emphasis added).

**VIII.  AMC'S MOTION TO COMPEL MEDIATION**

AMC moves the Court for an Order requiring the parties to attempt to resolve this matter through mediation. [Doc. 112]. BJC opposes the plaintiff's motion, arguing that it must have DOE approval to enter into a settlement, and that such approval will not be granted until BJC receives final clearance from the DOE Inspector General. [Doc. 114].

The Court notes that the DOE Inspector General has apparently been investigating this matter since September, 2004, but to date, has not taken any action against any of the parties involved in this case.

Local Rule 16.4 provides that "the Court may refer all or part of the underlying dispute to Mediation" with or without the agreement of the parties. The Court finds that this case is now appropriate for mediation, especially in light of the rulings contained in this Order, and that it would be in the best interest of all of the parties if mediation occurred. Neither BJC nor DOE has proffered to the Court a sufficient reason to justify any further delay in the mediation of this case. Accordingly, AMC's Motion to Compel Mediation [Doc. 112] is **GRANTED**. The parties shall

schedule a mediation on all remaining issues within sixty (60) days of the entry of this Order. All parties are expected to participate in the mediation process in good faith.

## IX.    CONCLUSION

For the foregoing reasons, AMC's Motion for Partial Summary Judgment [Doc. 49] is **DENIED**; Intervening Plaintiff North Atlanta National Bank's Motion for Partial Summary Judgment [Doc. 61] is **GRANTED**; the Motion by California Bank & Trust for Summary Judgment [Doc. 68] is **GRANTED**; the Motion for Partial Summary Judgment by Intervening Plaintiff Professional Project Services, Inc. [Doc. 71] is **DENIED**; BJC's Motion to Dismiss or for Summary Judgment [Doc. 76] is **GRANTED IN PART** and **DENIED IN PART;** and AMC's Motion to Compel Mediation [Doc. 112] is **GRANTED**.

**ORDER TO FOLLOW.**

ENTER:

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge